# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 5, 2007

## STATE OF TENNESSEE v. DAVID THREAT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-02463     John P. Colton, Jr., Judge**

---

**No. W2005-02813-CCA-R3-CD  - Filed August 8, 2007**

---

The defendant, David Threat, was convicted by a Shelby County jury of first degree felony murder and aggravated robbery, for which he received concurrent sentences of life and twelve years, respectively.  He raises three issues on appeal: (1) whether the trial court erred in denying his motion to suppress his statements to police; (2) whether the trial court erred in admitting a store surveillance videotape into evidence; and (3) whether the evidence was sufficient to sustain his felony murder conviction.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Jones, District Public Defender; Glenda Adams and David Bell, Assistant Public Defenders (at trial); and Phyllis Aluko, Assistant Public Defender (on appeal), for the appellant, David Threat.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and James Lammey and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On February 10, 2003, the elderly victim in this case, Margaret Lawless, was accosted outside a Memphis Garden Ridge store by a man who grabbed her purse, in the process knocking her to the ground and causing her serious injuries.  Later that same day, the defendant was arrested after he and his companions attempted to use the victim's credit card to purchase clothing at a Dillard's store. During his transport to the jail, the defendant made a short verbal statement in which he admitted that he had snatched the victim's purse.  He then gave a more detailed written statement to the

robbery detectives who interviewed him following his arrival at the jail. The victim died of her injuries early the next morning, and the defendant was subsequently charged with one count of first degree felony murder and one count of aggravated robbery.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress his statements to police on the basis that his arrest was unlawful and that he did not knowingly, intelligently, and voluntarily waive his right to counsel. A hearing on the motion to suppress was held on November 14, 2003, and April 11, 2005, with the State conducting direct examination of its witnesses at the first hearing date and the defendant cross-examining those same witnesses and presenting the defendant's testimony at the second hearing date. Memphis Police Officer Gary Gwyn testified that he and his partner were dispatched to the Wolfchase Galleria on the afternoon of February 10, 2003, in response to a call about a robbery suspect at the Dillard's store. He said that they arrested the defendant at approximately 6:30 p.m. and began transporting him to the robbery office at the jail at approximately 7:00 p.m. En route, the defendant, who was handcuffed in the back of their patrol car, began cursing aloud and at one point said, "Fuck it. I'm a man. I can take my charges. I took the lady's purse and I did it to pay my light bill."

Officer Gwyn identified the handwritten note memorializing the defendant's statement, which his partner prepared upon their arrival at the robbery office. This handwritten statement, which was signed by both Officer Gwyn and his partner, Officer Joel Bird, reads as follows:

> Fuck it, I'm going to be a man and take my charges. I took the lady's purse across from the Waffle House on Summer. I've been off my medicine for about a week. I normally don't do violent shit like snatching purses and selling dope. I just wanted enough money to pay my light bill.

Officer Gwyn said that he and his partner did not talk to each other about the case, initiate any conversation with the defendant about the robbery, or ask the defendant any questions about his spontaneous statement. He stated that they did not advise the defendant of his rights because they had been instructed to transport him to the robbery office at 201 Poplar Avenue, where the robbery detectives handled the advisement of rights. On cross-examination, Officer Gwyn testified that, when he arrived at the Dillard's store, the defendant was walking toward a vehicle matching the description of the one that had been used in the Garden Ridge robbery. He said that the person who had placed the call to the police department pointed the defendant out as the robbery suspect, and his partner then grabbed the defendant and handcuffed him. The defendant offered no resistance and the arrest transpired without incident.

Sergeant Joseph Pearlman of the Memphis Police Department testified that he was assigned to the robbery bureau in February 2003 and interviewed the defendant on the evening of February 10, 2003, during the course of his investigation of the Garden Ridge robbery. After introducing himself and asking the defendant the preliminary questions contained on the advice of rights form,

including his name and whether he could read and write, he handed the defendant the form and asked him to read it aloud. When the defendant had finished, he asked him to explain what the rights meant to him and the defendant replied, "I don't have to say shit to you if I don't want to." Sergeant Pearlman said he read the rights back to the defendant and asked him again if he understood the rights and wished to make a statement. The defendant replied yes and signed the waiver of rights form at 7:56 p.m. The defendant then made a statement in which he admitted his guilt for the robbery and minimized his girlfriend's involvement in the crime. Sergeant Pearlman identified the waiver of rights form and the statement, signed and initialed by the defendant, which were admitted as exhibits at the hearing. He said he informed the defendant at the beginning of the interview that he was being charged with robbery. He did not tell the defendant that he would be charged with murder because the victim was still alive at the time he conducted the interview.

Sergeant Pearlman testified that the defendant did not appear to be under the influence of any drug or suffering from mental problems, had no obvious wounds, and never asked for a doctor or a lawyer. On cross-examination, he testified that the defendant was responsive to his questions and informed him that he did not have any mental problems and was not under the influence of any drugs or alcohol. He said that the defendant was handcuffed to his chair during the interview, which took approximately one hour.

Sergeant Paula Harris of the Memphis Police Department testified that she was assigned to the robbery bureau on February 10, 2003, and participated in Sergeant Pearlman's interview with the defendant. She corroborated Sergeant Pearlman's account of the procedure by which the defendant was advised of his rights and testified that when asked what the rights meant to him, the defendant replied "that he didn't have to say shit if he didn't want to." She said the defendant read his statement before signing it, was responsive to their questions, appeared to understand his rights, and did not appear to be under the influence of drugs or alcohol. In addition, the defendant was coherent and exhibited no obvious signs of mental illness.

The defendant testified that he was walking out of the Dillard's store when a group of police officers swarmed him and threw him against a car. He said that one of the police officers hit him several times in the jaw before he was handcuffed and placed in the back of a patrol car. The officers never read him his rights, informed him that he was under arrest, or told him where he was being taken. According to the defendant, he blurted out that he had stolen the victim's purse after Officer Bird told him that he should make a spontaneous statement because it was only a misdemeanor case of purse snatching. The defendant testified that he had smoked two marijuana blunts at approximately 5:00 or 5:15 p.m. that day. He did not tell the officers about his marijuana use but repeatedly informed both the transporting and interviewing officers that he had been diagnosed with paranoid schizophrenia and had not been taking his prescription medication. The defendant said he gave his written statement out of fear of what the officers would do to him. On cross-examination, he acknowledged that he signed the waiver of rights form and initialed and signed his statement. He insisted, however, that the detectives never read him his rights and that he signed both documents without reading them.

In denying the defendant's motion to suppress, the trial court found, among other things, that the arresting officer had probable cause to believe that the defendant had committed a felony and thus, that the defendant's arrest was lawful; that the defendant volunteered the verbal statement in the patrol car; that the defendant had been adjudged competent on two separate occasions; and that the defendant's written statement was freely and voluntarily made after his valid waiver of his right to remain silent or have counsel present during questioning.

**Trial**

The victim's son, William Lawless, testified that his mother was eighty-eight years old at the time of her death. He said he was informed of his mother's injuries in the late afternoon or evening of February 10, 2003, and took the first available flight to Memphis from his Florida home the next morning. He stated that the victim died before he arrived in Memphis.

Diane Jalfon testified that she was standing in the checkout line of the Summer Avenue Garden Ridge store at approximately 2:00 p.m. on February 10, 2003, when she saw an elderly woman falling to the ground outside and an African-American man standing nearby. Jalfon identified a tape recording of her 9-1-1 call, which was admitted as an exhibit and played before the jury. After having her memory refreshed by listening to the tape, Jalfon testified that she saw the man grab the victim's purse and then get into a white car.

David Parrish testified that he was walking out of the Garden Ridge store at approximately 2:00 to 3:00 p.m. on February 10, 2003, when he saw an African-American man fighting an elderly woman for her purse outside the store. Running to help the victim, he momentarily lost sight of the struggle as he turned to go through the exit doors. By the time he reached her, the victim was lying on the ground and a white vehicle was exiting the parking lot and heading toward Summer Avenue and the interstate. Parrish said that blood began flowing out of the unconscious victim's mouth about thirty seconds after he reached her side. He estimated that the portion of the confrontation he witnessed lasted approximately five seconds and said it appeared that the victim was fighting to push the man away and hang on to her purse while the man was fighting to pull the purse from her. On cross-examination, he acknowledged that he did not see the defendant hit the victim.

Aereal Reed, the defendant's former girlfriend, testified that she and the defendant decided to snatch a woman's purse on February 10, 2003, because they needed money to pay her car note and their light bill. She said they drove around several shopping mall parking lots in her 1991 white Oldsmobile while the defendant searched for the right victim. After spending about forty-five minutes in the parking lot of a Poplar Avenue mall, where the defendant considered and rejected several potential victims, they decided to give up and go home. On their way home, however, they spotted the victim leaving a bank in her Cadillac. The defendant instructed Reed to follow the victim and she complied, trailing the victim's vehicle for about ten minutes until the victim pulled into the parking lot of the Garden Ridge store on Summer Avenue.

Reed testified that the victim parked her vehicle, got out, and began walking toward the store. Reed pulled her vehicle to the front of the store, let the defendant out, and waited with her engine running. When the defendant jumped back in her vehicle, he had a black leather purse and told her, "Go, go, go." Reed said that the defendant, who was happy, removed the credit cards, checkbook, and cash and threw the purse into a ravine they passed on their way home. She stated that Alicia Tuggle was already there when they arrived home and DeMarco Tuggle came over a short time later. Reed testified that she called to find out the credit limits on the victim's credit cards and learned that the Dillard's card carried a $7000 credit limit. When she informed the others, they all decided to go shopping at the Wolfchase Galleria.

Reed testified that a clerk in the men's department of the Dillard's store told her that she did not need identification to use a credit card. However, when she attempted to use the victim's credit card to purchase the items that each of them had selected, the computer asked for identification. At that point, the defendant and DeMarco left the store under the pretense that they were going to retrieve her identification from the car. Alicia initially remained in the store with her, but when Reed looked up a moment later, she saw that Alicia was gone as well. Reed testified that a Dillard's security guard handcuffed her and took her to the security office and that the police arrived a short time later and arrested her. She said she gave an initial statement to police that day in which she claimed she had no prior knowledge of the defendant's plans to rob the victim. The next day, however, she gave a second statement in which she admitted her involvement in the crime. Reed testified that she had been charged with facilitation of murder in the perpetration of a felony for her role in the crime.

William Cathey, a paramedic with the Memphis Fire Department, testified that when he responded to the Garden Ridge store on February 10, 2003, he found the victim lying in front of the store with a large pool of blood around her head. The victim had "some pretty large head wounds," was not breathing on her own, had a weak pulse and weak blood pressure, and was unresponsive. After inserting a breathing tube and treating her head wounds, he transported her to the hospital.

Dr. Teresa Campbell, the forensic pathologist who performed the autopsy of the victim's body, described the various bruises and injuries the victim sustained in the incident, including a large bruise on her left hip, a bruise on her left elbow, bruises to her left shoulder and arm, pelvic fractures, multiple rib fractures, a fractured collar bone, a bruised and swollen left eye, and a two-inch laceration on the left side of her head. In addition, the victim had a fractured skull, a subarachnoid hemorrhage, cerebral contusions, a subdural hematoma, and an intraventricular hemorrhage. Dr. Campbell testified that these injuries to the victim were caused by blunt trauma and were consistent with a fall. She determined that the cause of death was multiple injuries and that the manner of death was homicide.

DeMarco Tuggle testified that he went to the defendant's and Reed's home on the afternoon of February 10, 2003, to find the defendant talking with Reed and Alicia Tuggle, the witness's cousin, in a bedroom of the residence. The defendant, who was "all cheery" and excited, described how he had stolen an old woman's purse, stating that the woman tried to hang on when he first

grabbed at the purse so he snatched harder and she fell. Tuggle said the defendant told him that he committed the robbery because he was behind on his car note and light bill. He testified that the defendant tried to persuade him to deposit some of the victim's checks into his bank account, but he refused. The defendant then instructed Reed to call to find out the credit limits on the victim's credit cards. Tuggle stated that when Reed learned that one of the cards had a $7000 limit, they decided to go shopping at the Wolfchase Galleria.

Tuggle testified that they each picked out several outfits at the Dillard's store and gave them to Reed. He said that Reed and Alicia took the items to a saleswoman who appeared "cool," in that she looked to be the type who would not request identification, while he and the defendant walked out of the store. Next, Alicia came out of the store and told them that Reed had been caught. Tuggle testified that he, Alicia, and the defendant then drove around the parking lot for a while until the defendant announced that he had to go back for Reed. He said that he and Alicia fell asleep in the vehicle while waiting for the defendant to return. When they awoke, police officers were standing beside their vehicle. Tuggle said that he was arrested and taken to the robbery office, where he gave a statement to the police. He stated that he was charged with attempted theft for his role in the crime. On cross-examination, he testified that after the defendant signed his statement, he overheard one of the robbery detectives telling the other one to call the family and inform them that they could take the victim off life support.

Willene Jackson, an employee of the Dillard's store at the Wolfchase Galleria, testified that on the afternoon of February 10, 2003, the defendant came into her department accompanied by another man and two women. The defendant and each of his companions selected some clothing, which Reed attempted to purchase with a credit card in the name of Margaret Lawless. The computer asked for identification when Reed swiped the card, and Jackson informed her that she needed to see her driver's license. Reed replied that the license was in her car and that the men would retrieve it. Jackson testified that Dillard's Security Officer Hammonds became involved in the situation after the men left the store. She said she had reviewed the store surveillance videotape of the incident and that it fairly and accurately depicted what had occurred.

Bartlett Police Officer Brent Hammonds testified that he worked a second job as a security officer for the Dillard's store at the Wolfchase Galleria. He said he was on duty at the store on the afternoon of February 10, 2003, when the store's security camera operator, Martin Meeters, informed him of a situation in the men's department. Upon investigation, he discovered that Reed was attempting to purchase over $1000 worth of merchandise, without identification, using a credit card in the name of Margaret Lawless. In addition, she had a checkbook in the name of Margaret Lawless in her possession. Officer Hammonds said that when the men Reed had sent to retrieve her identification failed to return, he took Reed to the security office where she eventually admitted that she was not Margaret Lawless.

Officer Hammonds testified that he contacted the Memphis Police Department, learned that Margaret Lawless had been the victim of a purse snatching earlier in the afternoon, and obtained a description of the vehicle and suspects involved in the robbery. He then went outside to the parking

lot, where he found Alicia and DeMarco Tuggle asleep in the backseat of a vehicle that matched the description of the vehicle involved in the robbery. After reporting his findings to the Memphis Police Department, he started back inside the store to look for the defendant. En route, he saw the defendant exit the store and walk toward the suspect vehicle. Officer Hammonds testified that he had reviewed the store surveillance videotape filmed inside the store, in which he himself appeared. He identified the videotape, which was then admitted as an exhibit and played before the jury.

Officer Sherman Bonds of the Memphis Police Department, a crime scene investigator, identified various photographs and sketches he had made of the Garden Ridge robbery scene. On cross-examination, he testified that the area where the victim fell was on a slight incline.

William Lawless, recalled by the State, testified that he made the decision to take the victim off life support sometime between 12:00 and 2:00 a.m. on February 11, 2003, when the neurosurgeon who had operated on the victim telephoned to inform him of her condition.

Sergeant Joseph Pearlman testified that he investigated the Garden Ridge robbery. He said he first went to the hospital, where the victim's physicians informed him that the victim's condition was critical. He then returned to the robbery office to interview the defendant, who had been developed as a possible suspect for the crime. Sergeant Pearlman identified the defendant's signed advice of rights form and statement, which were admitted into evidence, and, at the request of the State, read the defendant's statement aloud. In the statement, the defendant, among other things, admitted that he had snatched the victim's purse, said he had seen the victim trip and fall but did not know if she was injured, and stated that he and his friends had gone to the Dillard's store to purchase clothing with the victim's credit card. Sergeant Pearlman testified that he knew the victim's condition was critical at the time he conducted the interview but did not learn that the victim had died until he arrived at work the following morning. He said that when the victim died, the case was transferred to the homicide bureau.

The defendant elected not to testify and rested his case without presenting any witnesses.

## ANALYSIS

### I. Denial of Motion to Suppress

The defendant first contends that the trial court erred in denying his motion to suppress his statements to police. He argues that the statements were obtained as the result of an unlawful arrest and that his history of mental illness, recent marijuana usage, and assault at the hands of one of his arresting officers, combined with the detective's failure to correctly inform him of the nature of his impending charges, rendered the statements unknowing and involuntary. The State argues that the evidence preponderates in favor of the trial court's finding that the defendant's statements were voluntary and knowing. We agree with the State.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, the findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn.1997).

The defendant first argues that his statements should have been suppressed because they were obtained as a result of an unlawful, warrantless arrest. However, as our supreme court has observed:

> An officer may make a warrantless arrest "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." Tenn. Code Ann. § 40-7-103(a)(3) (2003). Simply stated, the officer must have "probable cause to believe the person to be arrested has committed the crime." State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000). Probable cause depends on whether the facts and circumstances and reliable information known to the officer at the time of arrest were "'sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964); State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982)). Probable cause must be more than a mere suspicion. Melson, 638 S.W.2d at 350.

State v. Lawrence, 154 S.W.3d 71, 75-76 (Tenn. 2005).

In this case, the defendant was arrested after he and his companions had attempted to use the victim's stolen credit card at the Dillard's store. At the time of his arrest, the defendant was walking toward a vehicle that matched the description of the vehicle involved in the robbery and had just been pointed out to the officers as one of the robbery suspects. Under these circumstances, the officers had probable cause to arrest the defendant without a warrant. The defendant's claim that the arresting officers encouraged him to make the spontaneous statement in the patrol car is contradicted by Officer Gwyn's testimony that neither he nor his partner discussed the robbery or questioned the defendant about the crime. The trial court accredited the officer's testimony over that of the defendant, finding that "an interrogation did not occur in the squad car and that the defendant independently volunteered the statement." We conclude that the evidence does not preponderate against these findings.

We further conclude that the evidence does not preponderate against the trial court's findings that the defendant's written statement to the robbery detectives was knowing and voluntary after he had been given adequate Miranda warnings and signed a valid waiver of his right to remain silent or have an attorney present during questioning. In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)). The waiver must be "'made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994)). The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

Sergeants Pearlman and Harris both testified that the defendant read the advice of rights form aloud and expressed in his own words his understanding that he did not have to make a statement unless he wanted to. Both detectives also testified that the defendant did not appear to be under the influence of drugs or alcohol or to be suffering from any mental disability. They said that the defendant had no obvious injuries, appeared coherent and rational, and was responsive to their questions. Moreover, when specifically asked, the defendant informed Sergeant Pearlman that he was not under the influence of drugs and had no mental problems. The advice of rights form, signed by the defendant, indicates that he completed the eleventh grade. The statement itself reveals that the defendant was able to answer the detective's questions in a rational manner and give a coherent account of the crime, his motivation to commit the robbery, and the actions he took following the crime. At the conclusion of the statement, the defendant answered in the affirmative when asked whether he had given the statement of his own free will without threats, promises, or coercion from anyone and said that he would give the same answers in the future because his statement was "the truth." We conclude, therefore, that the trial court did not err in denying the defendant's motion to suppress his statements.

## II. Admission of Store Surveillance Videotape

The defendant next contends that the trial court erred in admitting the Dillard's store surveillance videotape into evidence. Specifically, he argues that by not presenting the testimony of the security officer who made the tape, the State failed to establish a sufficient chain of custody to establish the tape's authenticity. The State argues that the trial court properly admitted the videotape based on Officer Hammonds' testimony identifying himself in the tape and confirming that the tape contained an accurate depiction of the events that transpired in the store. We agree with the State.

Tennessee Rule of Evidence 901, which governs the authentication of evidence, provides in pertinent part:

> (a) General Provision. – The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.
>
> (b) Illustrations. – By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
>
> (1) Testimony of Witness With Knowledge. – Testimony that a matter is what it is claimed to be.

Tenn. R. Evid. 901 (a),(b)(1).

Both the store cashier and Officer Hammonds testified that they had reviewed the videotape, in which both appeared, and that it fairly and accurately depicted what had transpired. This was sufficient to establish the authenticity of the tape. See, e.g., State v. Andrew Thomas and Anthony Bond, No. W2001-02701-CCA-R3-DD, 2004 WL 370297, at *24 (Tenn. Crim. App. Feb. 27, 2004), (finding that trial court did not err in admitting surveillance tape into evidence based on testimony of store's manager that he had reviewed the film and that it accurately depicted what transpired within the store), aff'd, 158 S.W.3d 361 (Tenn. 2005). We conclude, therefore, that the trial court did not err in admitting the videotape.

### III. Sufficiency of the Evidence

As his final issue, the defendant contends that the evidence was insufficient to sustain his felony murder conviction. Specifically, he argues that there was insufficient evidence to show that the victim's death was caused by the injuries she received in the robbery or that he intended to cause her any harm. The State argues that the evidence was sufficient to sustain the conviction, and we agree.

When the sufficiency of the convicting evidence is challenged on appeal, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v.

Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, first degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). No culpable mental state is required for a conviction for felony murder "except the intent to commit the enumerated offenses or acts in those subdivisions." Tenn. Code Ann. § 39-13-202(b). Thus, the fact that the defendant may not have intended to harm the victim is irrelevant to his conviction. Furthermore, while it is true that Dr. Campbell described several conditions present in the victim that were unrelated to the incident, such as her hardening of the arteries, hip replacements, and osteoporosis, she unequivocally testified that the cause of death was the multiple injuries that the victim had sustained in the robbery. We, therefore, conclude that the evidence was more than sufficient to sustain the defendant's conviction for felony murder.

## CONCLUSION

We conclude that the trial court committed no error in denying the defendant's motion to suppress or in admitting the store surveillance videotape into evidence. We further conclude that the evidence was sufficient to sustain the defendant's felony murder conviction. Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-